44965. BURGESS et al. v. GORLIN et al.
44992. FIRST GEORGIA BANK v. GORLIN et al.
(365 SE2d 405)

PER CURIAM.

In this law suit the appellees; Steve Gorlin and Nick Long, sued the appellants; Samuel Burgess, Joseph Brown, the First Georgia Bank, and others for damages alleging fraud and unjust enrichment. The appellants' motions for directed verdicts were denied. The verdict and judgment were based upon fraud only. We reverse the Court of Appeals opinion in *Gorlin v. Halpern,* 184 Ga. App. 10 (360 SE2d 729) (1987).

The parties and their roles in this controversy appear as follows: Howard Halpern, President and Chief Executive Officer of American Food Purveyors, Inc., a food distribution company, (AFP); Daniel Baitcher, President and Chief Executive Officer of Amerdyne Industries, Inc. (Amerdyne); Samuel Burgess, Officer at First Georgia Bank in charge of the AFP account; Joseph Brown, Officer at First Georgia Bank who assisted Burgess with the AFP account; Steve Gorlin, former stock broker, currently financial analyst and business promoter; and his friend and attorney, Nick Long. It is important to understand the relationship of each of these parties to one another.

Howard Halpern started AFP and within a few short years he built the company from virtually nothing to a company with annual sales of almost $10 million. The company experienced tremendous growth, but was not making a profit because it was undercapitalized from its inception. At the end of 1971, AFP had a negative net worth

of approximately $70,000.

Daniel Baitcher owned Amerdyne. Amerdyne was registered with the Securities and Exchange Commission and shares in Amerdyne were traded over-the-counter. At the end of 1971, Amerdyne had a positive net worth of $250,000.

Steve Gorlin is a financial prodigy. At age 21 he was the youngest person to ever obtain a license from the SEC, a license that was revoked at one time.

Nick Long is the attorney who represented Gorlin in the license revocation proceeding, and they have both an attorney-client relationship and a friendship.

Gorlin learned that Amerdyne was attempting to acquire AFP. Gorlin's interest in becoming involved in the possible merger stemmed from the fact that Wall Street analysts were looking with favor on food industry stocks. Gorlin expected to make a great deal of money by obtaining shares in Amerdyne prior to a possible secondary public offering of Amerdyne. Gorlin discussed his plans with Nick Long who also became interested. Gorlin and Long began extensive investigations of Amerdyne and AFP sometime during November of 1972. As part of their investigation of AFP they talked with Burgess and Brown.

A written agreement was signed on January 8, 1973, between Amerdyne, AFP, Baitcher, Gorlin, and Halpern which stated, in part: "Gorlin agrees to obtain for Amerdyne the sum of $250,000, to be loaned to Amerdyne in full on or before February 15, 1973. . . . Said proceeds are for the purpose of a contribution to the capital by Amerdyne to [AFP] pursuant to the Letter of Intent between them executed December 19, 1972."[1] The agreement provided that if Gorlin could obtain, through a reputable underwriter, $1,500,000 for the purchase of Amerdyne shares, Baitcher would convey to Amerdyne and Amerdyne would convey to Gorlin 750,000 shares for obtaining the proceeds. The agreement also required Baitcher to transfer to Gorlin "in consideration for Gorlin's obtaining the [$250,000] loan, 250,000 shares of Amerdyne stock. Said shares shall be issued to Gor-

---

[1] When the Letter of Intent was executed, neither Gorlin nor Long was a shareholder or officer in AFP or Amerdyne. The December 19, 1972 Letter of Intent was between Amerdyne and AFP and as part of that agreement it was provided that Amerdyne would issue 1,500,000 shares of its stock in exchange for all of the issued and outstanding AFP shares and that Amerdyne would make a capital contribution in cash to AFP in the amount of $250,000 on or before February 15, 1973. The capital contribution from Amerdyne to AFP was to represent a debt due from AFP to Amerdyne. As part of the agreement it was provided that AFP would deliver to Amerdyne a certified financial statement no later than March 15, 1973. The certified financial statement was to disclose gross sales of not less than $9 million. In the event that the certified financial statement was not delivered on time or the gross sales were less than $9 million, Amerdyne had the right to terminate the agreement. (The certified financial statement was never generated.)

lin at the rate of one share of each dollar of loan obtained, up to the maximum of 250,000 shares." Gorlin was also granted two stock options under the agreement. The first option allowed Gorlin to purchase an additional 180,000 shares of Amerdyne at a dollar per share provided, however, if he failed to obtain all of the loan proceeds, the option would be null and void. The second option allowed Gorlin to purchase an additional 153,430 shares of Amerdyne stock for $0.18 per share provided, however, that if he failed to obtain all of the loan proceeds the second option would be null and void.

The money Gorlin obtained for Amerdyne pursuant to the agreement was given to Amerdyne by way of four checks issued to "Amerdyne Industries, Inc." and signed by Gorlin. On the bottom left side of three of the checks he wrote, "loan." The total of the four checks that Gorlin issued to Amerdyne was $135,000. Gorlin's checks were deposited into the Amerdyne account; thereafter, Amerdyne issued its checks to AFP.

On February 22, 1973, Amerdyne executed a promissory note, signed by Daniel Baitcher, to Steve Gorlin for $150,000 in which Amerdyne promised to pay Gorlin "On or before February 22, 1974 or upon receipts from underwriting, whichever comes first $150,000 with interest at the rate of 8%." (Long was not included on the note.)

Approximately four months after Gorlin issued his first check to Amerdyne, the First Georgia Bank discovered that Halpern had been engaging in a check-kiting scheme involving the AFP account and the bank closed the account. On June 18, 1973, AFP filed a petition in bankruptcy. (AFP operated within Chapter 11 from 1973 until 1978 when the bankruptcy proceedings terminated. AFP continued to operate until 1983.) Approximately a year and a half after the bankruptcy petition was filed, on January 6, 1975, Gorlin and Long filed their complaint.

The jury found in favor of Halpern, AFP, and Amerdyne. Thus we need not review Gorlin's and Long's contentions as to those parties. No one denied that Halpern created and ran the check-kiting scheme involving the AFP account. Halpern was convicted and served his sentence for the crimes.

The only allegations against Burgess, Brown, and First Georgia Bank were some statements made by Burgess and Brown that allegedly "induced" Gorlin and Long to invest $135,000 in AFP. When asked to summarize the facts upon which he based his contention that First Georgia Bank caused him to suffer damages, Gorlin responded that he would not have made his investment in AFP if he had not "had a reference from someone who did business with them [AFP] on a daily basis, over a long period of time that had a very high thoughts about the individual that ran the business [Halpern]. And about the business [AFP]."

The appellees vigorously contend that Amerdyne was just a "shell" or a mere "conduit" for their money and that they would not have invested $135,000 in AFP but for the statements made by Burgess and Brown. However, their own complaint and the evidence presented at trial negates their contention. In paragraph 10 of their complaint filed January 6, 1975, they asserted that Amerdyne had breached its agreement to issue its shares to them, that the shares were trading in the over-the-counter market, and that they were trading "up to $3.00 per share during the period." The evidence at trial showed that at the end of 1971, Amerdyne had a positive net worth of $250,000 and sales of $725,000.

It is apparent from the record that Amerdyne was not a "shell" and that Gorlin and Long did not negotiate with it as a "shell." They intended from the beginning to make a binding agreement with Amerdyne, a viable corporation, and when Amerdyne breached its contract with them they sued Amerdyne for the amount due on the note from Amerdyne to Gorlin and for the Amerdyne shares.

Gorlin and Long have no cause of action against the bank or the officers. Gorlin and Long did not invest in AFP, thus their claim that they were induced to invest in AFP by statements made by Burgess and Brown must fail. Gorlin entered into an agreement in which he agreed "to obtain for Amerdyne" $250,000. In consideration for his "obtaining" the money he was promised one share of Amerdyne for each dollar he obtained up to $250,000 and two stock options. After he had issued four checks payable to "Amerdyne Industries, Inc." in the amount of $135,000, he received a promissory note from Amerdyne in the amount of $150,000 at 8% interest. During this period of time, Amerdyne was a viable corporation. Its shares were trading over-the-counter at up to $3.00 per share, and it had a net worth in excess of the note. Gorlin and Long loaned money to Amerdyne with the expectation that Amerdyne would acquire AFP in the future. However, the merger was subject to various preconditions that did not occur and that were unrelated to anything that Burgess and Brown may have said. See note 1.

In light of the above facts, the trial court erred in not granting the appellants' motions for directed verdicts. The record does not support the appellees' contention that Burgess and Brown induced Gorlin and Long into investing in AFP. The officers never made statements to Gorlin or Long regarding the financial status of Amerdyne nor did they make statements to Amerdyne regarding the financial status of AFP. Furthermore, there is no evidence that Baitcher or Amerdyne depended on any assessment of the bank or its officers as to AFP's financial condition as a basis for its loan to AFP.

*Judgment reversed. All the Justices concur, except Hunt, J., who concurs in the judgment only, and Weltner, J., not participat-*

*ing.*

DECIDED FEBRUARY 25, 1988 —
RECONSIDERATION DENIED MARCH 30, 1988.

*Moulton, Carriere, Cavan & Maloof, J. Wayne Moulton,* for appellants (case no. 44965).

*Meals, Kirwan, Goger, Winter & Parks, Robert N. Meals, Larry H. Chesin,* for appellant (case no. 44992).

*Jones & Ludwick, Taylor W. Jones, Rickman P. Brown, Lefkoff, Duncan, Grimer & Dermer, Joseph Lefkoff,* for appellees.